[Civ. No. 16587. Second Dist., Div. Two. Nov. 12, 1948.]

JULIA LEARNED STEINER, Appellant, v. RAYMOND V. DARBY et al., Respondents.

[Civ. No. 16588. Second Dist., Div. Two. Nov. 12, 1948.]

HELEN PARKER et al., Appellants, v. COUNTY OF LOS ANGELES et al., Respondents.

A. L. Wirin, Fred Okrand, Gallagher, Margolis, McTernan & Tyre, John T. McTernan, William B. Murrish, Kenny & Cohn, Robert W. Kenny and Charles J. Katz for Appellants.

Harold W. Kennedy, County Counsel, Gerald G. Kelly and Robert L. Trapp, Deputy County Counsel, for Respondents.

McCOMB, J.—By stipulation of the parties the above entitled cases involving the same point are submitted for decision on a single set of briefs and since the identical point is involved in each case they will be treated as the same case for the purposes of this opinion.

### CONCEDED FACTS

On August 26, 1947, the Board of Supervisors of the County of Los Angeles adopted a resolution requiring each officer and employee under its jurisdiction to execute an oath and affidavit reading as follows:

### "OATH AND AFFIDAVIT

"DEPARTMENT_____

### "A. OATH OF OFFICE OR EMPLOYMENT

"I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution and laws of the State of California, against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office or employment on which I am about to enter or am now engaged. So HELP ME GOD.

### "B. AFFIDAVIT RE SUBVERSIVE ACTIVITY

"I do further swear (or affirm) that I do not advocate, nor am I now a member, nor have I been since December 7, 1941, a member of any political party or organization that advocates the overthrow of the Government of the United States, or State of California, or County of Los Angeles, by violence, except those specified as follows: _____ _____ and that during such time as I am an officer or employee of the County of Los Angeles, I will not advocate nor become a member of any political party or organization that advocates the overthrow of the Government of the United States, or State of California, or County of Los Angeles, by force or violence.

"C. Affidavit re Aliases

"I do further swear (or affirm) that I have never used or been known by any names other than those listed as follows:
_____."

Also included in the document is paragraph "D" requiring such officers and employees to indicate whether they have been a member of or supported any of some 142 named organizations.

September 3, 1947, plaintiffs, who are employees of the county of Los Angeles, filed complaints seeking an injunction to prevent defendants from requiring them to execute an affidavit as set forth above.

March 5, 1948, the Honorable Clarence M. Hanson, trial judge, sustained demurrers to plaintiffs' amended complaints without leave to amend, and on March 9, 1948, judgments of dismissal of the actions were entered. From these judgments plaintiffs appeal. There are also purported appeals from the orders sustaining defendants' demurrers to plaintiffs' complaints as amended.

### Question

*May the Board of Supervisors of the County of Los Angeles proceed with a fact-finding program under which the officers and employees within its jurisdiction are asked: (1) to take an oath of allegiance to the federal and state Constitutions and the laws of California as against all enemies of the United States of America, the State of California, and the county of Los Angeles; and (2) as such officers and employees to answer upon their oath or affirmation, (a) whether or not they advocate the overthrow of the government by force or violence and whether or not since December 7, 1941, they have been members of any organizations or political parties that advocate the overthrow of the government by force or violence, as well as to sign an affidavit not to advocate the overthrow of the government by force and violence or to become a member of an organization or political party which so advocates so long as the person is a county officer or employee; (b) to state any aliases they have ever used or been known by; and (c) to indicate whether they have ever been a member of or directly or indirectly supported any of the organizations listed in the affidavit submitted to them?*

This question must be answered in the affirmative. The mere asking of the question points unerringly to the answer any *loyal, sane* citizen of the United States of America would give to it. It is an unequivocal "Yes."

The people of the State of California are supreme and have the undoubted right to protect themselves and to preserve the form of government which they have adopted against any and all enemies whether they be domestic or foreign. It is not alone the right of the people to protect themselves and their chosen form of government against attack from all sources, but it is their duty to do so, since they have guaranteed to the people of the United States ''a Republican Form of Government'' in this state. (U. S. Const., art. IV, § 4; Const. of Calif., art. I, § 3.)

Every citizen is a minority member of society, and the form of government which the people of the several states have adopted guarantees to each minority member, as well as to the majority, a republican form of government in his own state. Such form of government has long since passed through the experimental stage. It has proved to be the most satisfying to the aspirations of mankind, and at the same time the most practical government yet devised. Trial and experience have demonstrated it to be the best form of government that this world has ever known. Our system has maintained democratic processes, improved the condition of the people, preserved liberty, promoted justice, encouraged the arts and sciences, and served the needs of changing peoples. All this in spite of an occasional administrative failure to adhere to the Constitution of the United States, due to incompetence or criminal design of some individual.

The people acting through their duly authorized representatives have assumed the foregoing obligation and have plenary power to perform it under any and all conditions.

The extreme limit to which the people may exercise this power is found in their undisputed right to require a citizen to give his time, be maimed, or even sacrifice his life in defense of his country.

In *Arver* v. *United States*, 245 U.S. 366 [38 S.Ct. 159, 62 L.Ed. 349, 358, at page 390], Mr. Chief Justice White, speaking for the Supreme Court of the United States, says: ''Finally, as we are unable to conceive upon what theory the exaction by government from the citizen of the performance of his supreme and noble duty of contributing to the defense of the rights and honor of the nation as the result of a war declared by the great representative body of the people can be said to be the imposition of involuntary servitude, in violation of the prohibitions of the 13th Amendment, we are

constrained to the conclusion that the contention to that effect is refuted by its mere statement.''

Again in *United States* v. *Macintosh,* 283 U.S. 605, 624 et seq. [51 S.Ct. 570, 75 L.Ed. 1302, 1310], Mr. Justice Sutherland, in discussing the question of an individual citizen's allegiance to the government of the United States, succinctly states the situation as follows:

''In *Jacobson* v. *Massachusetts,* 197 U.S. 11, 29, 49 L.Ed. 643, 651, 25 S.Ct. 358, 3 Ann.Cas. 765, this court, speaking of the liberties guaranteed to the individual by the 14th Amendment, said:

'' '. . . and yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense.' . . .

''When he speaks of putting his allegiance to the will of God above his allegiance to the government, it is evident, in the light of his entire statement, that he means to make *his own interpretation* of the will of God the decisive test which shall conclude the government and stay its hand. We are a Christian people (*Church of the Holy Trinity* v. *United States,* 143 U.S. 457, 470, 36 L.Ed. 227, 231, 232, 12 S.Ct. 511), according to one another the equal right of religious freedom, and acknowledging with reverence the duty of obedience to the will of God. But, also, we are a nation with the duty to survive; a nation whose Constitution contemplates war as well as peace; whose government must go forward upon the assumption, and safely can proceed upon no other, that unqualified allegiance to the nation and submission and obedience to the laws of the land, as well those made for war as those made for peace, are not inconsistent with the will of God.''

Clearly, since the government of the United States has the right to force an individual citizen (a minority member of society) to surrender his life in defense of his country, any state in attempting to perpetuate its loyalty to the union has the unquestioned right and duty to exact from its citizens adherence to all lesser measures which have for their purposes the preservation of our form of government and the repression of its enemies. Therefore, when a person enters the employ of this state or any subdivision thereof, he impliedly surrenders certain natural rights, which would remain his if he

were a private citizen only, just the same as he would surrender certain privileges if he were to enter private employment.

This rule is well stated by Mr. Justice Holmes in *McAuliffe* v. *Mayor etc. of City of New Bedford,* 155 Mass. 216 [29 N.E. 517]. The great jurist was then sitting on the Supreme Court of Massachusetts. He had before him a petition for mandamus to restore the petitioner to the office of policeman in the city of New Bedford. Petitioner had been removed by the mayor after a hearing because he had violated a rule which read: " 'No member of the department shall be allowed to solicit money or any aid, on any pretense, for any political purpose whatever.' *There was also evidence that he had been a member of a political committee, which likewise was prohibited.*" (Italics ours.) The jurist's unanswerable logic proceeded: "It is argued by the petitioner that the mayor's finding did not warrant the removal; that the part of the rule violated was invalid, as invading the petitioner's right to express his political opinions; . . . One answer to this argument . . . is that there is nothing in the constitution or the statute to prevent the city from attaching obedience to this rule as a condition to the office of policeman, and making it part of the good conduct required. The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. *There are few employments for hire in which the servant does not agree to suspend his constitutional rights of free speech as well as of idleness by the implied terms of his contract.*" (Italics ours.)

An analogous rule is found in the case of *Christal* v. *Police Commission,* 33 Cal.App.2d 564 [92 P.2d 416]. In this case petitioners who were formerly policemen of the city and county of San Francisco sought by mandamus to be reinstated in their positions. The cause of their removal was predicated upon the fact that they were subpoenaed to appear before the grand jury and refused either to produce their private records or to answer questions concerning their assets and income. The court said at page 567, et seq.:

". . . the main question involved is whether appellants, while holding positions as police officers, could exercise the constitutional privilege of refusing to testify before the grand jury under the circumstances and still insist upon retaining their positions as police officers . . . We need not further discuss the nature of said privilege here as it is conceded by all that said officers could exercise that privilege in any proceeding.

We are concerned here only with the result of the exercise of such privilege, by those holding the positions of police officers, in an investigation by which it was sought to determine whether such officers had been guilty of criminal activities in connection with their duties as police officers. . . .

"We are not unmindful of the constitutional privilege above mentioned which may be exercised by all persons, including police officers, in any proceeding, civil or criminal. . . . As we view the situation, when pertinent questions were propounded to appellants before the grand jury, the answers to which questions would tend to incriminate them, they were put to a choice which they voluntarily made. Duty required them to answer. Privilege permitted them to refuse to answer. They chose to exercise the privilege, but the exercise of such privilege was wholly inconsistent with their duty as police officers. They claim that they had a constitutional right to refuse to answer under the circumstances, but it is certain that they had no constitutional right to remain police officers in the face of their clear violation of the duty imposed upon them. (*McAuliffe* v. *Mayor of New Bedford*, 155 Mass. 216 [29 N.E. 517].) We are of the opinion that such a violation of duty would constitute cause for dismissal even in the absence of any specific rule requiring such officers to give testimony before the grand jury, or of any specific rule relating to 'conduct unbecoming an officer.' That such conduct constituted 'conduct unbecoming an officer,' there can be no doubt. . . .

"There is nothing startling in the conception that a public servant's rights to retain his office or employment should depend upon his willingness to forego his constitutional rights and privileges to the extent that the exercise of such rights and privileges may be inconsistent with the performance of the duties of his office or employment. One of the most cherished rights guaranteed by the Constitution is that of freedom of speech, yet no one would maintain that a police officer could fully exercise that right without violating the duties imposed upon him by the acceptance of his employment as a police officer. The right of freedom of speech might be relied upon by a police officer who had disclosed to persons conducting an illegal establishment, information concerning the plan of the police department to conduct a raid upon such establishment, but the furnishing of such information would be inconsistent with and violative of the duties of such police officers. Such conduct would constitute cause for dismissal with or without any specific rule on the

particular subject, and in the event of the adoption of a rule providing for dismissal of any officer making such disclosure, the claim that such rule violated any constitutional right of the officers would be clearly untenable.''

In *Hayman* v. *City of Los Angeles,* 17 Cal.App.2d 674 [62 P.2d 1047], a motor truck driver sought by mandamus to be reinstated to his position in the city of Los Angeles. He claimed that his discharge was improper on the theory of the violation of his constitutional rights of freedom of speech and freedom of assembly. It appeared that he had caused dissension among employees by circulating a handbill protesting against the rules adopted by the board of public works. The court disposed of petitioner's claim that his constitutional guarantees of freedom of speech and freedom of assembly entitled him to conduct such activities by the following statement at page 678 et seq.:

''He seeks to justify his activities upon the ground of his constitutional right of freedom of speech and assembly. The right which is involved here is not that which petitioner thinks has been denied him, but is the right of respondents to exercise a reasonable supervision over city employees, to the end that proper discipline may be maintained and that activities among employees be not allowed to disrupt or impair the public service. Such is not only the right but the duty of the city and its several departments. In the exercise of this duty they must be allowed a wide discretion and their acts are not subject to review by the courts until they have reached the point of illegality.''

Finally, Mr. Chief Justice Gibson, in the case of *Communist Party* v. *Peek,* 20 Cal.2d 536 [127 P.2d 889], speaking for the Supreme Court of California, states the rule as follows, page 551:

''There is no doubt, however, that the remainder of section 2540.4 comes within the Legislature's power to prescribe tests and conditions for participation in primary elections. *This power certainly includes the right to adopt tests designed to exclude those political parties advocating the overthrow of the government by unlawful means or those parties carrying on a program of sabotage, force and violence, sedition or treason.* Such groups constitute an immediate threat to the functioning of our institutions, including the continued exercise of the right of suffrage. Since it is within the power of the state as to such groups to restrict even the rights of free speech and free press (see, for example, *Whitney* v. *California,* 274

U.S. 357 [47 S.Ct. 641, 71 L.Ed. 1095]; *Stromberg* v. *California,* 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117]; *DeJonge* v. *Oregon,* 299 U.S. 353, 364 [57 S.Ct. 255, 81 L.Ed. 278]), it clearly was within the reasonable bounds of the Legislature's power to determine that these bodies should also be barred from the primary election ballot. Under such circumstances we have no doubt that the Legislature's power to exclude parties and individuals from participation in a primary election extends to those groups whose political beliefs create a clear danger to the continued existence of the institutions under which our constitutional form of government functions. Section 2540.4 of the Elections Code, omitting the invalid portions which are clearly severable, must be upheld as a proper condition for participation in primary elections in this state in the following form: 'Notwithstanding any other provisions of this code, no party shall be recognized or qualified to participate in any primary election . . . which either directly or indirectly carries on, advocates, teaches, justifies, aids or abets the overthrow by any unlawful means of, or which either directly or indirectly carries on, advocates, teaches, justifies, aids or abets a program of sabotage, force and violence, sedition or treason against, the Government of the United States or of this State.' " (Italics ours. See, also, *Danskin* v. *San Diego Unified School Dist.,* 28 Cal.2d 536, 548 [171 P.2d 885]; *Congress of Industrial Organ.* v. *City of Dallas,* (Tex.Civ.App.) 198 S.W.2d 143, 146; *Bell* v. *District Court of Holyoke,* 314 Mass. 622 [51 N.E.2d 328, 330, 150 A.L.R. 126]; *United States* v. *Bryan,* 72 F.Supp. 58, 63.)

The foregoing cases support the obvious rule that plaintiffs, as public servants, have the implied duty to support the form of government lawfully chosen by the people whom they are employed to represent, and that they impliedly agreed, when they accepted public employment, to act as representatives of the people and not to advocate destruction of the government by force or violence. By accepting public employment they forego any privilege they may have had as private citizens to advocate the overthrow of the government by force and violence. It is inconceivable that they should be permitted to represent the people, be supported by the people, and at the same time have the privilege of advocating the overthrow of the very government by which they are employed and obtain their livelihood. If they cannot

subscribe to the prescribed affidavit they may join those who serve themselves in the ranks of private employment.

 There is nothing in the foregoing rule or affidavit which in the slightest degree affects the plaintiffs' rights of political belief or religious belief. Defendants are simply performing their duty by making proper inquiry of their employees as to their loyalty to their employer, the people of the State of California. There is nothing in the oath or affidavit which requires plaintiffs to surrender any constitutional right. If they desire to advocate the overthrow of the government of the United States, the State of California, or the county of Los Angeles, they may do so by any and all lawful means after first resigning from their public employment. It needs no argument to support the thesis that their employer, the people of the State of California, need not wait until after an employee has committed some overt act before making inquiry as to his fitness to occupy the position which he holds. Certainly it is clear that a private employer would be perfectly justified in requiring an employee to submit to questioning and examination before leaving his place of employment in order to ascertain whether the employee was stealing property of the employer, and he might obviously question his employee as to whether he intended to take or destroy the employer's property. A servant employed by the people is held to an even higher standard, and his employer, the people, not only may, but it is their duty through their authorized representatives to make proper inquiry as to his fitness for the position which he occupies and as to his intentions and acts relative to his loyalty to the people.

Many fraternal and other organizations require that a neophyte assume an obligation of loyalty to the government of the United States of America prior to his attaining membership in the organization. It has never been questioned, nor could it reasonably be questioned that the organization had a right to exact such an obligation prior to accepting the applicant for membership. None of his constitutional rights is invaded by such requirement. For example, no one would think of claiming that a prospective member of the Benevolent and Protective Order of Elks was having his constitutional rights violated because such order, before admitting a member, requires that he take an obligation to be loyal to the government of the United States of America.

If a private organization can lawfully require a loyalty obligation, without question the people may require such an obligation from a person seeking to remain in a public position with its attendant perquisites and manifold benefits.

The obligation or oath required of defendants is substantially the same as that which a foreign born person is required to take before becoming entitled to the honor, benefits and privileges of being a naturalized citizen of the United States of America.* Since a naturalized citizen has the same rights and duties as a native born, with certain constitutional exceptions, there is not any logical reason why a native born citizen should object to assuming a similar obligation.

The Honorable Clarence M. Hanson, the trial judge, in sustaining the demurrers without leave to amend, filed an opinion in which we concur. Such opinion with appropriate changes is adopted and made a part of this decision. It reads thus:

"The primary question presented, viewed in its broadest aspect, is whether the board of supervisors may require the officers and employees under its jurisdiction (1) to take an oath of allegiance to the federal and state Constitutions, and the laws of California as against all enemies of the United States and the state, and (2) require such officers and employees to answer upon their oath certain questions that touch upon the oath [of allegiance].

"The plaintiff in cause No. 534177 is a civil service employee of the County of Los Angeles. She alleges in her amended complaint that she is *not* a member of the Communist Party or of any of the organizations listed on the questionnaire submitted to her. She avers, however, that the requirement thereby sought to be imposed upon her, i. e., that she take the oath in the form tendered and respond under oath to the questionnaire submitted, violates her constitutional rights as an American citizen.

"The fifteen plaintiffs in cause No. 534288 allege in their amended complaint that they are civil service employees of the county of Los Angeles. They likewise aver that the requirement sought to be imposed upon them, i. e., that they take the oath in the form tendered and respond under oath to the questionnaire submitted, violates their constitutional rights as American citizens.

---

*[54 Stats. 1157], 8 U.S.C.A. (1942) (Title Aliens and Nationality), p. 742, § 735.

"The form of the oath here in question, a part of the questionnaire, reads as follows: (Here is recited the oath above set forth.) . . .

"Without narrating in detail the allegations of the two amended complaints it will suffice to say that they allege, in almost every conceivable way, that the defendant board and its agents are without power to impose the requirements in question; that the manner, method and application of the power, if power there be, is without legal sanction and violative of the statutory and constitutional rights of the plaintiffs and all employees of the defendant county required to submit to the questionnaire and take the oath in question.

"In this state it is well established that the board of supervisors under our Constitution, the state laws and the charter of the county, exercises the powers of the county, except as it is otherwise specifically limited. The board is vested with the power to appoint all county officers and employees, not otherwise provided for by the charter. However, with respect to the classified service, the appointments must be made from the so-called eligible civil service list.

"The civil service provisions of the charter authorize the civil service commission to prescribe, amend and enforce rules for the classified service, to make investigations concerning the enforcement and effect of its rules, and the efficiency of the service. Moreover, the commission is empowered to reject candidates who wish to be placed upon civil service rolls where they fail to measure up to the reasonable requirements of the commission and likewise it is authorized to drop persons who have attained the eligible list, for like reasons.

"In case the appointing power wishes to discharge a civil service employee the reasons therefor must be given and, thereupon, if the employee so desires he is entitled to a hearing before the commission. If the commission finds that the reasons are not sufficient, the discharge is void, despite anything the appointing power can do about it.

"From what has so far been said, it is self-evident that neither the board nor its agents can discharge a civil service employee for any cause that the civil service commission finds insufficient. Accordingly, if in the view of the board of supervisors, or its agents as the appointing power, a civil service employee should be discharged on the sole ground that the employee is 'subversive,' the discharge or attempt to discharge on that ground is of no effect if, on hearing, the commission holds otherwise.

"What then are the powers of the board and its agents with respect to laying a *good or bad* foundation for a discharge of an employee? Clearly, the appointing power—whether it be private or public—is entitled, subject to a review by the commission, to discharge for cause or no cause, and, as a corollary, to investigate as it sees fit as a basis for such cause, save and except as it is restricted by law.

■ "Section 41 of the charter provides that 'no person in the classified service . . . shall be appointed, or reduced or removed or in any way favored or discriminated against because of his political or religious opinions or affiliations.' Aside from this restriction there are no restrictions by the charter or by law on the appointing power of the board or its agents in appointing or discharging civil service employees, except as noted.

"It seems self-evident, then, that aside from any restraining constitutional provision, the board of supervisors itself or through its agents duly authorized may investigate to its heart's content the character, the antecedents, the viewpoints and the affiliations of any of its employees, including those in the civil service, so long as the investigation does not touch upon the political or religious opinions or affiliations of the employee. Moreover, it would seem to follow that so long as the board does not impinge upon these restrictions, it may, like any private employer, demand of its employee an oath, if it chooses, and a response to a questionnaire as a basis in whole or in part for his discharge. The fact that a person is on the civil service rolls does not insulate him from the lawful actions of the appointing power or enable him to restrict them, except for the rights specifically granted to him by the provisions of the charter. Like any private employer the county may question its employees *and demand* unquestioned loyalty, *in the manner it lays it down,* except as restricted by law. To be sure, a private employer, or a public employer, may now and then demand more than is necessary, in the view of individuals concerned or of the courts, but that fact, if it be a fact, is not a ground for the slightest interference on the part of the courts. (*United Public Workers* v. *Mitchell,* 1947, [330 U.S. 75, 67 S.Ct. 556] 91 L.Ed. 509 [754].)

"There remains then to consider whether the action, or the alleged threatened action, of the board or its agents, violates the rights of the plaintiffs under the federal or the state Constitutions. The plaintiffs contend that their rights in

this respect are violated in view of the provisions of the First and Fourteenth Amendments of the federal Constitution and the cognate provisions of our state Constitution.

"Shortly stated, the plaintiffs contend that the action of the board and its agents in requiring the employees to take the oath propounded and to give answer to the questionnaire, under oath, violates an employee's rights guaranteed to him under the federal and the state Constitutions. These rights, as set forth by the plaintiffs, are as follows:

"(1) 'Every citizen may freely speak . . . his sentiments on all subjects, being responsible for the abuse of that right . . .' (California Constitution, Article I, Section 9.)

"(2) 'The people shall have the right to freely assemble together to consult for the common good, to instruct their Representatives, and to petition the Legislature for redress of grievances.' (Calif. Const., Art. I, Sec. 10.)

"(3) 'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' (14th Amendment, U. S. Const.)

"In viewing the constitutional mantle thrown around an individual it is important to remember that the mantle is a *safeguard*, not *absolute*, but *relative* and *qualified*. Our federal and state constitutional provisions, which guarantee freedom of speech and of opinion, freedom of the press, freedom of assembly, are not licenses to do completely as one chooses, without regard to the other fellow, who possesses exactly the same liberties. When one purports to pursue the liberties granted by the Constitution he needs to remember that the other fellow has equal liberties and, what is more, he has the liberty to refuse to listen to another's speech or opinion and the right to refuse to yield to him his own right of assembly. Conceivably, a person may be of the opinion that it is entirely proper to drive through a stop light, or on city streets at 80 miles an hour in violation of an ordinance, but even so, setting up constitutional provisions as a defense will prove ill-advised. So, too, one may believe that the 14th Amendment is a defense to acts that sabotage the government or are subversive to it, but one will quickly find that the constitutional provision against treason is not cut down or modified, in the least, by the First Amendment or any other provision of the federal or state constitutions.

"In what manner, then, do the requirements as laid down by the board, or as applied by its agents, impinge on the constitutional rights of the plaintiffs or any other officer or employee subject to the general jurisdiction of the board? Some of the plaintiffs, but not all of them, do say that they have no objection to an oath that would require them to support the Constitution, federal and state, but that the oath in question goes further and, consequently, violates their constitutional rights. The oath, it is true, calls upon the employee not only to support the Constitution, state and federal, but to abjure enemies of the government, both domestic and foreign, but even if that be true, as it is, what is wrong with that in these United States? Moreover, where is the constitutional provision which directly or indirectly prohibits the board from demanding that an employee subscribe to the oath? The answer is, there is none, and therefore no more need be said on that subject.

"We come next to the questionnaire. It requires that the employee, aside from taking the oath submitted, answer under oath (1) whether or not he advocates the overthrow of the government and whether or not, since December 1, 1941, he has been a member of any political party or organization that advocates the overthrow of the government by force or violence; (2) the name or names which he has used or been known by; (3) whether or not he has been a member of or directly or indirectly supported any of the organizations listed on the questionnaire.

"With respect to these particular questions in the questionnaire, the plaintiffs contend they violate their constitutional rights, in that, whether they do or do not personally advocate the overthrow of the government by force or violence, or belong or do not belong to organizations with such objectives, the provisions of the two constitutions sustain them in their refusal to answer. This is the crux of the argument of the plaintiffs in this aspect of the case. Accordingly, we may now proceed at once to a determination of the issue thus made.

"A year ago the Supreme Court of the United States answered these identical contentions in the case of *United Public Workers* v. *Mitchell*, [330 U.S. 75, 67 S.Ct. 556] 91 L.Ed. 509 [754]. Accordingly we may now well turn to that decision for the light it throws on the very similar problem which is posed in the case before us. In that case, instituted by civil service employees, as is the case here, it was contended that the so-called federal Hatch Act [54 Stats. 767, 18 U.S.C.

§ 61h], in prohibiting federal classified civil service employees from taking 'any active part in political management or in political campaigns,' violated their constitutional rights in that it prohibited them from doing the very thing which an ordinary citizen could do with impunity. Accordingly, in that case as here, the plaintiffs sought declaratory relief and an injunction. In holding that the act was constitutional, the court pointed out that as early as 1882 the court had held that it was entirely proper for Congress to prohibit party activity by federal employees in the classified service. The court said: 'The conviction that an actively partisan governmental personnel threatens good administration has deepened since *Ex Parte Curtis* (106 U.S. 371 (1882) [1 S.Ct. 381, 27 L.Ed. 232]) . . . Congress and the President are responsible for an efficient public service. If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, we see no constitutional objection . . . To declare that the present supposed evils of political activity are beyond the power of Congress to redress would leave the Nation impotent to deal with what many sincere men believe is a material threat to the democratic system.

" ' . . . The determination of the extent to which political activities of government employees shall be regulated lies primarily with Congress. Courts will interfere only when such regulation passes beyond the general existing conception of governmental power. . .

" 'When actions of civil servants in the judgment of Congress menace the integrity and the competency of the service, legislation to forestall such danger and adequate to maintain its usefulness is required. The Hatch Act is the answer of Congress to this need. We cannot say with such a background that those restrictions are unconstitutional.' . . .

"In view of the decisions just quoted . . . it seems clear that the acts of the defendant Board and its agents, whether they go to the extent claimed by the plaintiffs or not, are within the scope of the power of the board and are in no sense unconstitutional. Whether the appointing power will or will not discharge employees as claimed by the plaintiffs, for causes of the character enumerated, and whether the civil service Commission will uphold such discharges, if any, on such causes, are not matters upon which this Court may speculate or adjudicate at this time. . . ."

 An order sustaining a demurrer is not appealable but is reviewable on an appeal from the judgment. (*Harmon* v. *De Turk*, 176 Cal. 758, 761 [169 P. 680]. See also cases cited in 2 McKinney New California Digest, 1946, page 141, Appeal and Error, section 39 (b).) Hence the purported appeals from the orders sustaining the demurrers are dismissed.

The judgments are and each is affirmed.

Moore, P. J., and Wilson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 10, 1949. Carter, J., voted for a hearing.