Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

[L. A. No. 29515.   In Bank.   Dec. 21, 1967.]

ROBERT S. VOGEL, Plaintiff and Respondent, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

Harold W. Kennedy and John D. Maharg, County Counsel, Robert C. Lynch, Assistant County Counsel, and Donald K. Byrne, Deputy County Counsel, for Defendants and Appellants.

A. L. Wirin, Fred Okrand and Laurence R. Sperber for Plaintiff and Respondent.

Albert M. Bendich, Coleman A. Blease, Richard W. Jennings, Robert M. O'Neil, Marshall W. Krause and Paul N. Halvonik as Amici Curiae on behalf of Plaintiff and Respondent.

PETERS, J. — Defendants appeal, in this taxpayer's action, from a summary judgment enjoining them from expending public funds (Code Civ. Proc., § 526a), for administering or enforcing the second paragraph of the oath required of public employees by section 3 of article XX of the California Constitution. The trial court held that the second paragraph of the oath is invalid, and granted the injunction. We agree with this determination.

Section 3 of article XX of the California Constitution provides:

"Members of the Legislature, and all public officers and

employees, executive, legislative, and judicial, except such inferior officers and employees as may be by law exempted, shall, before they enter upon the duties of their respective offices, take and subscribe the following oath or affirmation:

" 'I, ——, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

" 'And I do further swear (or affirm) that I do not advocate, nor am I a member of any party or organization, political or otherwise, that now advocates the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means; that within the five years immediately preceding the taking of this oath (or affirmation) I have not been a member of any party or organization, political or otherwise, that advocated the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means except as follows: ——. (If no affiliations, write in the words "No Exceptions") and that during such time as I hold the office of —— (name of office) I will not advocate nor become a member of any party or organization, political or otherwise, that advocates the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means.'

"And no other oath, declaration, or test, shall be required as a qualification for any public office or employment.

" 'Public officer and employee' includes every officer and employee of the State, including the University of California, every county, city, city and county, district, and authority, including any department, division, bureau, board, commission, agency, or instrumentality of any of the foregoing."

In 1952, this court in *Pockman* v. *Leonard*, 39 Cal.2d 676 [249 P.2d 267], upheld the validity of the substantially similar oath found in sections 3100-3109 of the Government Code, known commonly as the Levering Act. In that case the petitioner claimed several violations of federal constitutional guarantees, and it was held that nearly all such claims were

answered adversely to him by then recent decisions of the United States Supreme Court. The principal case relied upon was *Adler* v. *Board of Education of the City of New York,* 342 U.S. 485 [96 L.Ed. 517, 72 S.Ct. 380, 27 A.L.R.2d 472].

Subsequent decisions of the United States Supreme Court, however, have established constitutional doctrines not recognized in *Adler,* and the holding in that case has since been rejected by the United States Supreme Court. (*Keyishian* v. *Board of Regents,* 385 U.S. 589, 595 [17 L.Ed.2d 629, 636, 87 S.Ct. 675].) Accordingly we must reexamine *Pockman* v. *Leonard, supra,* 39 Cal.2d 676, in the light of the recent decisions of this court and the United States Supreme Court.

■ It is now well settled that, although an individual can claim no constitutional right to obtain public employment or receive any other publicly conferred benefit, the government may not condition public employment or receipt of such benefit upon any terms that it may choose to impose, and that the power of government to withhold benefits from its citizens does not encompass a "lesser" power to grant such benefits upon an arbitrary deprivation of constitutional rights. (*Keyishian* v. *Board of Regents, supra,* 385 U.S. 589, 602 [17 L.Ed. 2d 629, 640, 87 S.Ct. 675]; *Sherbert* v. *Verner,* 374 U.S. 398, 404-406 [10 L.Ed.2d 965, 970-971, 83 S.Ct. 1790]; *Speiser* v. *Randall,* 357 U.S. 513, 518-519 [2 L.Ed.2d 1460, 1468-1469, 78 S.Ct. 1332]; *Bagley* v. *Washington Township Hospital Dist.,* 65 Cal.2d 499, 504 [55 Cal.Rptr. 401, 421 P.2d 409]; *Fort* v. *Civil Service Com.,* 61 Cal.2d 331, 334 [38 Cal.Rptr. 625, 392 P.2d 385]; *Syrck* v. *California Unemployment Ins. Appeals Board,* 54 Cal.2d 519, 532 [7 Cal.Rptr. 97, 354 P.2d 629]; *Danskin* v. *San Diego Unified School Dist.,* 28 Cal.2d 536, 545-546 [171 P.2d 885].)

■ When the government seeks to require a limitation of constitutional rights as a condition of public employment, it bears the heavy burden of demonstrating the practical necessity for the limitation. The conditions annexed to the publicly conferred benefit must reasonably tend to further the purposes of the government in granting the benefit, and the utility of imposing the conditions must manifestly outweigh the impairment of constitutional rights. (*Sherbert* v. *Verner, supra,* 374 U.S. 398, 406-409 [10 L.Ed.2d 965, 971-974, 83 S.Ct. 1790]; *Bates* v. *Little Rock,* 361 U.S. 516, 524 [4 L.Ed. 2d 480, 486, 80 S.Ct. 412]; *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, 505-508; *Fort* v. *Civil Service Com., supra,* 61 Cal.2d 331, 337-338.)

■ Even where a compelling state purpose is present, restrictions on the cherished freedom of association protected by the First Amendment and made applicable to the states by the Fourteenth Amendment must be drawn with narrow specificity. First Amendment freedoms are delicate and vulnerable and must be protected wherever possible. When government seeks to limit those freedoms on the basis of legitimate and substantial governmental purposes, such as eliminating subversives from the public service, those purposes cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. Precision of regulation is required so that the exercise of our most precious freedoms will not be unduly curtailed except to the extent necessitated by the legitimate governmental objective. (*Keyishian* v. *Board of Regents, supra,* 385 U.S. 589, 602-603 [17 L.Ed.2d 629, 640-641, 87 S.Ct. 675] ; *Elfbrandt* v. *Russell,* 384 U.S. 11, 15 et seq. [16 L.Ed.2d 321, 324, 86 S.Ct. 1238] ; *N.A.A.C.P.* v *Button,* 371 U.S. 415, 432-433 [9 L.Ed. 2d 405, 417-418, 83 S.Ct. 328] ; *Shelton* v. *Tucker,* 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247] ; *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, 506-509 ; *Fort* v. *Civil Service Com., supra,* 61 Cal.2d 331, 337-338.)

■ Two recent decisions of the United States Supreme Court control this case. They make it clear that the oath required by the second paragraph of section 3 of article XX of the California Constitution is invalid because it bars persons from public employment for a type of association that may not be proscribed consistently with First Amendment rights. These cases determine that the paragraph is invalid.

In *Elfbrandt* v. *Russell, supra,* 384 U.S. 11, the oath had been interpreted by the Supreme Court of Arizona to proscribe knowing and willful membership in the Communist Party or any other organization having for one of its purposes the overthrow of the government of Arizona or any of its political subdivisions where the employee had knowledge of the unlawful purpose. The United States Supreme Court reasoned that quasi-political parties or other groups may embrace both legal and illegal aims (*Scales* v. *United States,* 367 U.S. 203, 229 [6 L.Ed.2d 782, 801, 81 S.Ct. 1469]) ; that in such a situation there is a danger that one in sympathy with the lawful aims of the organization, but not intending to accomplish them by violence, might be punished for his lawful adherence to lawful and constitutionally protected purposes (*Noto* v.

*United States,* 367 U.S. 290, 299-300 [6 L.Ed.2d 836, 842-843, 81 S.Ct. 1517]) ; and that, since nothing in the Arizona oath or its construction excluded association by one who does not subscribe to the organization's unlawful purpose (cf. *Aptheker* v. *Secretary of State,* 378 U.S. 500 [12 L.Ed.2d 992, 84 S.Ct. 1659]), the oath was invalid. (*Elfbrandt* v. *Russell, supra,* 384 U.S. at pp. 15-16 [16 L.Ed.2d at pp. 324-325, 86 S.Ct. 1238].)

The United States Supreme Court also pointed out that persons who join an organization but do not share in its unlawful activities pose no threat either as citizens or as public employees, that a law which applies to membership without the specific intent to further the illegal aims of the organization infringes unnecessarily on protected freedoms and rests on the doctrine of guilt by association, and that such a law cannot stand. (*Elfbrandt* v. *Russell, supra,* 384 U.S. at pp. 17-19 [16 L.Ed.2d at pp. 325-326, 86 S.Ct. 1238].)

*Elfbrandt* was reaffirmed and followed in *Keyishian* v. *Board of Regents, supra,* 385 U.S. 589. There the United States Supreme Court held invalid parts of the Feinberg Law of New York, including a section which made knowing membership in the Communist Party, as such, prima facie evidence of disqualification of teachers. Again the court held that mere knowing membership without a specific intent to further the unlawful aims of an organization is not a constitutionally adequate basis for exclusion from the governmental positions involved. The court pointed out that mere knowing membership, even with knowledge of the Communist Party's unlawful goals, does not warrant criminal punishment (see *Scales* v. *United States, supra,* 367 U.S. 203, 228 [6 L.Ed.2d 782, 800-801, 81 S.Ct. 1469] ; *Noto* v. *United States, supra,* 367 U.S. 290, 299 [6 L.Ed.2d 836, 842, 81 S.Ct. 1517] ; *Yates* v. *United States,* 354 U.S. 298, 331 [1 L.Ed.2d 1356, 1382, 77 S.Ct. 1064]), or a finding of moral unfitness justifying disbarment (*Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 244-246 [1 L.Ed.2d 796, 804-806, 77 S.Ct. 752, 64 A.L.R.2d 288]). The court again pointed out that a law which applies to membership without the specific intent to further the unlawful aims of the organization rests on the doctrine of guilt by association and that the doctrine has " 'no place here.' " (*Keyishian* v. *Board of Regents, supra,* 385 U.S. at p. 607 [17 L.Ed.2d at p. 643, 87 S.Ct. 675].)

The most recent expression of the United States Supreme Court is to be found in *Whitehill* v. *Elkins* (November 6,

1967) 389 U.S. 54 [19 L.Ed.2d 228, 88 S.Ct. 184] where that court, relying on *Keyishian* and *Elfbrandt* held overly broad an oath required by Maryland. For similar reasons, the court has held invalid oaths required by Florida and Washington. (*Cramp* v. *Board of Public Instruction*, 368 U.S. 278, 287 [7 L.Ed.2d 285, 292, 82 S.Ct. 275]; *Baggett* v. *Bullitt*, 377 U.S. 360, 366 et seq. [12 L.Ed.2d 377, 382, 84 S.Ct. 1316].) On the basis of *Keyishian* and *Elfbrandt*, the New Hampshire Supreme Court recently held that state's oath invalid (*Opinion of the Justices*, 108 N.H. 62 [228 A.2d 165, 167-168]), and due to similar considerations of the requirements of clarity and precision in restrictions in the sensitive and important First Amendment area, the Oregon Supreme Court invalidated an oath required by that state (*Brush* v. *State Board of Higher Education* (Ore.) 422 P.2d 268, 269-270). Federal courts have held invalid oaths required by Colorado, Georgia, and Idaho. (*Gallagher* v. *Smiley*, 270 F.Supp. 86, 87 [three-judge court]; *Georgia Conference of American Assn. of University Professors* v. *Board of Regents*, 246 F.Supp. 553, 555 [same]; *Heckler* v. *Shepard*, 243 F.Supp. 841, 845 et seq. [same].)

The second paragraph of the oath required by section 3 of article XX of the California Constitution proscribes membership, past, present, or future, in any party or organization which advocates the overthrow of the government by force, violence or other unlawful means, and there is no provision requiring a specific intent to further the unlawful aims of the organization. The oath proscribes not only knowing membership with an intent to further the unlawful purposes of the organization but also nonactive membership and knowing membership which is not accompanied by such specific intent. Thus, a teacher or governmental executive may not join an international organization, containing some members from communist countries, for the purpose of obtaining knowledge in his chosen field because should the communist members obtain positions of leadership there is a danger that one of the purposes of the organization may be the overthrow of our government. Notwithstanding the value to our society and our government of any knowledge or experience gained by membership in such an organization and notwithstanding the innocence of the motive in seeking membership, such membership is proscribed by the language of the oath in question.

The county counsel urges that the second paragraph of the oath required by section 3 of article XX of the California Constitution should be construed to proscribe only membership in

organizations and parties when the member has the specific intent to further the unlawful aims of the group. In this connection, he relies upon *Hirschman* v. *County of Los Angeles,* 39 Cal.2d 698, 702-703 [249 P.2d 287, 250 P.2d 145], where this court, in order to sustain the validity of an oath, construed the oath as requiring the plaintiffs to designate only those of the named organizations which they "knew" advocated overthrow of the government by force, or which "to their knowledge" had been held by a court to advocate such action.

The reading into the oath involved in *Hirschman* of a requirement of knowledge was reasonable because a person executing the oath would not be expected to list organizations having unlawful objectives if he was unaware of the unlawful objectives. An entirely different situation is presented with regard to a specific intent to further the unlawful aims of an organization. There is nothing in the language of the second paragraph of the oath required by section 3 of article XX. of the California Constitution which even hints that membership is not proscribed unless the member has a specific intent to further the unlawful aims of the organization, and a prospective employee considering membership in one of the organizations described therein, or an existing employee seeking to join such an organization, however much he may oppose the unlawful aims of the organization and espouse only the lawful objectives, will in the face of the unqualified language of the oath shrink from jeopardizing his chances for future public employment.

The county counsel in effect is asking this court to write a new condition into the oath, one which finds no support in the language of the oath. He is not seeking to construe that language, but to rewrite the oath. For this reason, there can be no application here of the rule that if the terms of a statute are reasonably subject to a meaning consistent with the requirements of the Constitution the statute will be given that meaning rather than another in conflict with the Constitution. (Cf. *County of Madera* v. *Gendron,* 59 Cal.2d 798, 801 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555].)

This court has recently considered governmental regulations which suffered from impermissible overbreadth in that they improperly proscribed activities protected by the First Amendment as well as activities legitimately subject to regulation. In the absence of any language therein permitting limitation of the regulations to those activities properly sub-

26

ject to governmental restriction, the regulations were held invalid, because this court cannot rewrite the regulations. (*Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, 509-510; *Fort* v. *Civil Service Com., supra,* 61 Cal.2d 331, 340; *Kinnear* v. *City etc. of San Francisco,* 61 Cal.2d 341, 343 [38 Cal.Rptr. 631, 392 P.2d 391].)

On the authority of *Keyishian* v. *Board of Regents, supra,* 385 U.S. 589, and *Elfbrandt* v. *Russell, supra,* 384 U.S. 11, it must be held that the oath required by the second paragraph of section 3, article XX of the California Constitution is invalid. *Pockman* v. *Leonard, supra,* 39 Cal.2d 676, holding to the contrary, is overruled.[1]

The judgment is affirmed.

Traynor, C. J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would reverse the judgment of the trial court.

The questions now presented to this court have previously been passed upon. In *Steiner* v. *Darby,* 88 Cal.App.2d 481, [199 P.2d 429], it was stated: "On August 26, 1947, the Board of Supervisors of the County of Los Angeles adopted a resolution requiring each officer and employee under its jurisdiction to execute an oath and affidavit reading as follows:

" 'OATH AND AFFIDAVIT

" 'Department ——
" 'A. OATH OF OFFICE OR EMPLOYMENT
" 'I, ——, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution and laws of the State of California, against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office or employment on which I am about to enter or am now engaged. So Help Me God.

---

[1]This conclusion makes it unnecessary to consider the additional contentions of plaintiff and amici curiae, and we express no opinion thereon, that the oath is vague, that it constitutes an improper prior restraint on the exercise of First Amendment freedoms, that it improperly shifts the burden of proof of loyalty, that it constitutes a bill of attainder, that the absence of a provision for a hearing results in a denial of due process of law, that the oath invades a field pre-empted by federal law, and that the oath results in a violation of the privilege against self-incrimination.

" 'B. AFFIDAVIT RE SUBVERSIVE ACTIVITY

" 'I do further swear (or affirm) that I do not advocate, nor am I now a member, nor have I been since December 7, 1941, a member of any political party or organization that advocates the overthrow of the Government of the United States, or State of California, or County of Los Angeles, by violence, except those specified as follows: —— and that during such time as I am an officer or employee of the County of Los Angeles, I will not advocate nor become a member of any political party or organization that advocates the overthrow of the Government of the United States, or State of California, or County of Los Angeles, by force or violence.

" 'C. AFFIDAVIT RE ALIASES

" 'I do further swear (or affirm) that I have never used or been known by any names other than those listed as follows: ——.'

"Also included in the document is paragraph 'D' requiring such officers and employees to indicate whether they have been a member of or supported any of some 142 named organizations.

"September 3, 1947, plaintiffs, who are employees of the county of Los Angeles, filed complaints seeking an injunction to prevent defendants from requiring them to execute an affidavit as set forth above.

"March 5, 1948, the Honorable Clarence M. Hanson, trial judge, sustained demurrers to plaintiffs' amended complaints without leave to amend, and on March 9, 1948, judgments of dismissal of the actions were entered. From these judgments plaintiffs appeal. There are also purported appeals from the orders sustaining defendants' demurrers to plaintiffs' complaints as amended.

## "QUESTION

"*May the Board of Supervisors of the County of Los Angeles proceed with a fact-finding program under which the officers and employees within its jurisdiction are asked: (1) to take an oath of allegiance to the federal and state Constitutions and the laws of California as against all enemies of the United States of America, the State of California, and the county of Los Angeles; and (2) as such officers and employees to answer upon their oath or affirmation, (a) whether or not they advocate the overthrow of the government by force or violence and whether or not since December 7, 1941, they have*

been members of any organizations or political parties that advocate the overthrow of the government by force or violence, as well as to sign an affidavit not to advocate the overthrow of the government by force and violence or to become a member of an organization or political party which so advocates so long as the person is a county officer or employee; (b) to state any aliases they have ever used or been known by; and (c) to indicate whether they have ever been a member of or directly or indirectly supported any of the organizations listed in the affidavit submitted to them?

"This question must be answered in the affirmative. The mere asking of the question points unerringly to the answer any *loyal, sane* citizen of the United States of America would give to it. It is an unequivocal 'Yes.'

"The people of the State of California are supreme and have the undoubted right to protect themselves and to preserve the form of government which they have adopted against any and all enemies whether they be domestic or foreign. It is not alone the right of the people to protect themselves and their chosen form of government against attack from all sources, but it is their duty to do so, since they have guaranteed to the people of the United States 'a Republic Form of Government' in this state. (U.S. Const., art. IV, § 4; Const. of Calif., art. I, § 3.)

"Every citizen is a minority member of society, and the form of government which the people of the several states have adopted guarantees to each minority member, as well as to the majority, a republican form of government in his own state. Such form of government has long since passed through the experimental stage. It has proved to be the most satisfying to the aspirations of mankind, and at the same time the most practical government yet devised. Trial and experience have demonstrated it to be the best form of government that this world has ever known. Our system has maintained democratic processes, improved the condition of the people, preserved liberty, promoted justice, encouraged the arts and sciences, and served the needs of changing peoples. All this in spite of an occasional administrative failure to adhere to the Constitution of the United States, due to incompetence or criminal design of some individual.

"The people acting through their duly authorized representatives have assumed the foregoing obligation and have plenary power to perform it under any and all conditions.

"The extreme limit to which the people may exercise this

power is found in their undisputed right to require a citizen to give his time, be maimed, or even sacrifice his life in defense of his country.

"In *Arver* v. *United States,* 245 U.S. 366 at page 390 [62 L.Ed. 349, 358, 38 S.Ct. 159], Mr. Chief Justice White, speaking for the Supreme Court of the United States, says: 'Finally, as we are unable to conceive upon what theory the exaction by government from the citizen of the performance of his supreme and noble duty of contributing to the defense of the rights and honor of the nation as the result of a war declared by the great representative body of the people can be said to be the imposition of involuntary servitude, in violation of the prohibitions of the 13th Amendment, we are constrained to the conclusion that the contention to that effect is refuted by its mere statement.'

"Again in *United States* v. *Macintosh,* 283 U.S. 605, 624 et seq. [75 L.Ed. 1302, 1310, 51 S.Ct. 570], Mr. Justice Sutherland, in discussing the question of an individual citizen's allegiance to the government of the United States, succinctly states the situation as follows:

" 'In *Jacobson* v. *Massachusetts,* 197 U.S. 11, 29 [49 L.Ed. 643, 651, 25 S.Ct. 358, 3 Ann.Cas. 765], this court, speaking of the liberties guaranteed to the individual by the 14th Amendment, said:

" ' ". . . and yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense." ' . . .

" 'When he speaks of putting his allegiance to the will of God above his allegiance to the government, it is evident, in the light of his entire statement, that he means to make *his own interpretation* of the will of God the decisive test which shall conclude the government and stay its hand. We are a Christian people (*Church of the Holy Trinity* v. *United States* 143 U.S. 457, 470 [36 L.Ed. [226] 227, 231, 232, 12 S.Ct. 511]), according to one another the equal right of religious freedom, and acknowledging with reverence the duty of obedience to the will of God. But, also, we are a nation with the duty to survive; a nation whose Constitution contemplates war as well as peace; whose government must go forward upon the assumption, and safely can proceed upon no other, that unqualified allegiance to the nation and submission

30

and obedience to the laws of the land, as well those made for war as those made for peace, are not inconsistent with the will of God.'

"Clearly, since the government of the United States has the right to force an individual citizen (a minority member of society) to surrender his life in defense of his country, any state in attempting to perpetuate its loyalty to the union has the unquestioned right and duty to exact from its citizens adherence to all lesser measures which have for their purposes the preservation of our form of government and the repression of its enemies. Therefore, when a person enters the employ of this state or any subdivision thereof, he impliedly surrenders certain natural rights, which would remain his if he were a private citizen only, just the same as he would surrender certain privileges if he were to enter private employment.

"This rule is well stated by Mr. Justice Holmes in *McAuliffe* v. *Mayor etc. of City of New Bedford,* 155 Mass. 216 [29 N.E. 517]. The great jurist was then sitting on the Supreme Court of Massachusetts. He had before him a petition for mandamus to restore the petitioner to the office of policeman in the city of New Bedford. Petitioner had been removed by the mayor after a hearing because he had violated a rule which read: ' "No member of the department shall be allowed to solicit money or any aid, on any pretense, for any political purpose whatever." *There was also evidence that he had been a member of a political committee, which likewise was prohibited.'* (Italics ours.) The jurist's unanswerable logic proceeded: 'It is argued by the petitioner that the mayor's finding did not warrant the removal; that the part of the rule violated was invalid, as invading the petitioner's right to express his political opinions; . . . One answer to this argument . . . is that there is nothing in the constitution or the statute to prevent the city from attaching obedience to this rule as a condition to the office of policeman, and making it part of the good conduct required. The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. *There are few employments for hire in which the servant does not agree to suspend his constitutional rights of free speech as well as of idleness by the implied terms of his contract.'* (Italics ours.)

"An analogous rule is found in the case of *Christal* v. *Police Commission,* 33 Cal.App.2d 564 [92 P.2d 416]. In this case petitioners who were formerly policemen of the city and

county of San Francisco sought by mandamus to be reinstated in their positions. The cause of their removal was predicated upon the fact that they were subpoenaed to appear before the grand jury and refused either to produce their private records or to answer questions concerning their assets and income. The court said at page 567, et seq.:

" '. . . the main question involved is whether appellants, while holding positions as police officers, could exercise the constitutional privilege of refusing to testify before the grand jury under the circumstances and still insist upon retaining their positions as police officers . . . We need not further discuss the nature of said privilege here as it is conceded by all that said officers could exercise that privilege in any proceeding. We are concerned here only with the result of the exercise of such privilege, by those holding the position of police officers, in an investigation by which it was sought to determine whether such officers had been guilty of criminal activities in connection with their duties as police officers. . . .

" 'We are not unmindful of the constitutional privilege above mentioned which may be exercised by all persons, including police officers, in any proceeding, civil or criminal. . . . As we view the situation, when pertinent questions were propounded to appellants before the grand jury, the answers to which questions would tend to incriminate them, they were put to a choice which they voluntarily made. Duty required them to answer. Privilege permitted them to refuse to answer. They chose to exercise the privilege, but the exercise of such privilege was wholly inconsistent with their duty as police officers. They claim that they had a constitutional right to refuse to answer under the circumstances, but it is certain that they had no constitutional right to remain police officers in the face of their clear violation of the duty imposed upon them. (*McAuliffe* v. *Mayor* [*etc. of City*] *of New Bedford*, 155 Mass. 216 [29 N.E. 517].) We are of the opinion that such a violation of duty would constitute cause for dismissal even in the absence of any specific rule requiring such officers to give testimony before the grand jury, or of any specific rule relating to "conduct unbecoming an officer." That such conduct constituted "conduct unbecoming an officer," there can be no doubt. . . .

" 'There is nothing startling in the conception that a public servant's rights to retain his office or employment should depend upon his willingness to forego his constitutional rights

and privileges to the extent that the exercise of such rights and privileges may be inconsistent with the performance of the duties of his office or employment. One of the most cherished rights guaranteed by the Constitution is that of freedom of speech, yet no one would maintain that a police officer could fully exercise that right without violating the duties imposed upon him by the acceptance of his employment as a police officer. The right of freedom of speech might be relied upon by a police officer who had disclosed to persons conducting an illegal establishment, information concerning the plan of the police department to conduct a raid upon such establishment, but the furnishing of such information would be inconsistent with and violative of the duties of such police officers. Such conduct would constitute cause for dismissal with or without any specific rule on the particular subject, and in the event of the adoption of a rule providing for dismissal of any officer making such disclosure, the claim that such rule violated any constitutional right of the officers would be clearly untenable.'

"In *Hayman* v. *City of Los Angeles,* 17 Cal.App.2d 674 [62 P.2d 1047], a motor truck driver sought by mandamus to be reinstated to his position in the city of Los Angeles. He claimed that his discharge was improper on the theory of the violation of his constitutional rights of freedom of speech and freedom of assembly. It appeared that he had caused dissension among employees by circulating a handbill protesting against the rules adopted by the board of public works. The court disposed of petitioner's claim that his constitutional guarantee of freedom of speech and freedom of assembly entitled him to conduct such activities by the following statement at page 678 et seq.

" 'He seeks to justify his activities upon the ground of his constitutional right of freedom of speech and assembly. The right which is involved here is not that which petitioner thinks has been denied him, but is the right of respondents to exercise a reasonable supervision over city employees, to the end that proper discipline may be maintained and that activities among employees be not allowed to disrupt or impair the public service. Such is not only the right but the duty of the city and its several departments. In the exercise of this duty they must be allowed a wide discretion and their acts are not subject to review by the courts until they have reached the point of illegality.'

"Finally, Mr. Chief Justice Gibson, in the case of *Commu-*

*nist Party* v. *Peek,* 20 Cal.2d 536 [127 P.2d 889], speaking for the Supreme Court of California, states the rule as follows, page 551:

" 'There is no doubt, however, that the remainder of section 2540.4 comes within the Legislature's power to prescribe tests and conditions for participation in primary elections. *This power certainly includes the right to adopt tests designed to exclude those political parties advocating the overthrow of the government by unlawful means or those parties carrying on a program of sabotage, force and violence, sedition or treason.* Such groups constitute an immediate threat to the functioning of our institutions, including the continued exercise of the right of suffrage. Since it is within the power of the state as to such groups to restrict even the rights of free speech and free press (see, for example, *Whitney* v. *California,* 274 U.S. 357 [71 L.Ed. 1095, 47 S.Ct. 641]; *Stromberg* v. *California,* 283 U.S. 359 [75 L.Ed. 1117, 51 S.Ct. 532, 73 A.L.R. 1484]; *DeJonge* v. *Oregon,* 299 U.S. 353, 364 [81 L.Ed. 278, 284, 57 S.Ct. 255]), it clearly was within the reasonable bounds of the Legislature's power to determine that these bodies should also be barred from the primary election ballot. Under such circumstances we have no doubt that the Legislature's power to exclude parties and individuals from participation in a primary election extends to those groups whose political beliefs create a clear danger to the continued existence of the institutions under which our constitutional form of government functions. Section 2540.4 of the Elections Code, omitting the invalid portions which are clearly severable, must be upheld as a proper condition for participation in primary elections in this state in the following form: ''Notwithstanding any other provisions of this code, no party shall be recognized or qualified to participate in any primary election . . . which either directly or indirectly carries on, advocates, teaches, justifies, aids or abets the overthrow by any unlawful means of, or which either directly or indirectly carries on, advocates, teaches, justifies, aids or abets a program of sabotage, force and violence, sedition or treason against the Government of the United States or of this State.'' ' (Italics ours. See, also, *Danskin* v. *San Diego Unified School Dist.,* 28 Cal.2d 536, 548 [171 P.2d 885]; *Congress of Industrial Organizations* v. *City of Dallas* (Tex.Civ.App.) 198 S.W.2d 143, 146; *Bell* v. *District Court of Holyoke,* 314 Mass. 622 [51 N.E.2d 328, 330, 150 A.L.R. 126]; *United States* v. *Bryan,* 72 F.Supp. 58, 63.)

"The foregoing cases support the obvious rule that plaintiffs, as public servants, have the implied duty to support the form of government lawfully chosen by the people whom they are employed to represent, and that they impliedly agreed, when they accepted public employment, to act as representatives of the people and not to advocate destruction of the government by force or violence. By accepting public employment they forego any privilege they may have had as private citizens to advocate the overthrow of the government by force and violence. It is inconceivable that they should be permitted to represent the people, be supported by the people, and at the same time have the privilege of advocating the overthrow of the very government by which they are employed and obtain their livelihood. If they cannot subscribe to the prescribed affidavit they may join those who serve themselves in the ranks of private employment.

"There is nothing in the foregoing rule or affidavit which in the slightest degree affects the plaintiffs' rights of political belief or religious belief. Defendants are simply performing their duty by making proper inquiry of their employees as to their loyalty to their employer, the people of the State of California. There is nothing in the oath or affidavit which requires plaintiffs to surrender any constitutional right. If they desire to advocate the overthrow of the government of the United States, the State of California, or the county of Los Angeles, they may do so by any and all lawful means after first resigning from their public employment. It needs no argument to support the thesis that their employer, the people of the State of California, need not wait until after an employee has committed some overt act before making inquiry as to his fitness to occupy the position which he holds. Certainly it is clear that a private employer would be perfectly justified in requiring an employee to submit to questioning and examination before leaving his place of employment in order to ascertain whether the employee was stealing property of the employer, and he might obviously question his employee as to whether he intended to take or destroy the employer's property. A servant employed by the people is held to an even higher standard, and his employer, the people, not only may, but it is their duty through their authorized representatives to make proper inquiry as to his fitness for the position which he occupies and as to his intentions and acts relative to his loyalty to the people.

"Many fraternal and other organizations require that a

neophyte assume an obligation of loyalty to the government of the United States of America prior to his attaining membership in the organization. It has never been questioned, nor could it reasonably be questioned that the organization had a right to exact such an obligation prior to accepting the applicant for membership. None of his constitutional rights is invaded by such requirement. For example, no one would think of claiming that a prospective member of the Benevolent and Protective Order of Elks was having his constitutional rights violated because such order, before admitting a member, requires that he take an obligation to be loyal to the government of the United States of America.

"If a private organization can lawfully require a loyalty obligation, without question the people may require such an obligation from a person seeking to remain in a public position with its attendant prerequisites and manifold benefits.

"The obligation or oath required of defendants is substantially the same as that which a foreign born person is required to take before becoming entitled to the honor, benefits and privileges of being a naturalized citizen of the United States of America.* Since a naturalized citizen has the same rights and duties as a native born, with certain constitutional exceptions, there is not any logical reason why a native born citizen should object to assuming a similar obligation.

"The Honorable Clarence M. Hanson, the trial judge, in sustaining the demurrers without leave to amend, filed an opinion in which we concur. Such opinion with appropriate changes is adopted and made a part of this decision. It reads thus:

" 'The primary question presented, viewed in its broadest aspect, is whether the board of supervisors may require the officers and employees under its jurisdiction (1) to take an oath of allegiance to the federal and state Constitutions, and the laws of California as against all enemies of the United States and the state, and (2) require such officers and employees to answer upon their oath certain questions that touch upon the oath [of allegiance].

" 'The plaintiff in cause No. 534177 is a civil service employee of the County of Los Angeles. She alleges in her amended complaint that she is *not* a member of the Communist Party or of any of the organizations listed on the ques-

---

*"[54 Stats. 1157], 8 U.S.C.A. (1942) (Title Aliens and Nationality), p. 742, § 735."

tionnaire submitted to her. She avers, however, that the requirement thereby sought to be imposed upon her, i.e., that she take the oath in the form tendered and respond under oath to the questionnaire submitted, violates her constitutional rights as an American citizen.

" 'The fifteen plaintiffs in cause No. 534288 allege in their amended complaint that they are civil service employees of the county of Los Angeles. They likewise aver that the requirement sought to be imposed upon them, i.e., that they take the oath in the form tendered and respond under oath to the questionnaire submitted, violates their constitutional rights as American citizens.

" 'The form of the oath here in question, a part of the questionnaire, reads as follows: (Here is recited the oath above set forth.) . . .

" 'Without narrating in detail the allegations of the two amended complaints it will suffice to say that they allege, in almost every conceivable way, that the defendant board and its agents are without power to impose the requirements in question; that the manner, method and application of the power, if power there be, is without legal sanction and violative of the statutory and constitutional rights of the plaintiffs and all employees of the defendant county required to submit to the questionnaire and take the oath in question.

" 'In this state it is well established that the board of supervisors under our Constitution, the state laws and the charter of the county, exercises the powers of the county, except as it is otherwise specifically limited. The board is vested with the power to appoint all county officers and employees, not otherwise provided for by the charter. However, with respect to the classified service, the appointments must be made from the so-called eligible civil service list.

" 'The civil service provisions of the charter authorize the civil service commission to prescribe, amend and enforce rules for the classified service, to make investigations concerning the enforcement and effect of its rules, and the efficiency of the service. Moreover, the commission is empowered to reject candidates who wish to be placed upon civil service rolls where they fail to measure up to the reasonable requirements of the commission and likewise it is authorized to drop persons who have attained the eligible list, for like reasons.

" 'In case the appointing power wishes to discharge a civil service employee the reasons therefor must be given and, thereupon, if the employee so desires he is entitled to a hear-

ing before the commission. If the commission finds that the reasons are not sufficient, the discharge is void, despite anything the appointing power can do about it.

" 'From what has so far been said, it is self-evident that neither the board nor its agents can discharge a civil service employee for any cause that the civil service commission finds insufficient. Accordingly, if in the view of the board of supervisors, or its agents as the appointing power, a civil service employee should be discharged on the sole ground that the employee is "subversive," the discharge or attempt to discharge on that ground is of no effect if, on hearing, the commission holds otherwise.

" 'What then are the powers of the board and its agents with respect to laying a *good or bad* foundation for a discharge of an employee? Clearly, the appointing power—whether it be private or public—is entitled, subject to a review by the commission, to discharge for cause or no cause, and, as a corollary, to investigate as it sees fit as a basis for such cause, save and except as it is restricted by law.

" 'Section 41 of the charter provides that "no person in the classified service . . . shall be appointed, or reduced or removed or in any way favored or discriminated against because of his political or religious opinions or affiliations." Aside from this restriction there are no restrictions by the charter or by law on the appointing power of the board or its agents in appointing or discharging civil service employees, except as noted.

" 'It seems self-evident, then, that aside from any restraining constitutional provision, the board of supervisors itself or through its agents duly authorized may investigate to its heart's content the character, the antecedents, the viewpoints and the affiliations of any of its employees, including those in the civil service, so long as the investigation does not touch upon the political or religious opinions or affiliations of the employee. Moreover, it would seem to follow that so long as the board does not impinge upon these restrictions, it may, like any private employer, demand of its employee an oath, if it chooses, and a response to a questionnaire as a basis in whole or in part for his discharge. The fact that a person is on the civil service rolls does not insulate him from the lawful actions of the appointing power or enable him to restrict them, except for the rights specifically granted to him by the provisions of the charter. Like any private employer the county may question its employees *and demand* unquestioned

loyalty, *in the manner it lays it down,* except as restricted by law. To be sure, a private employer, or a public employer, may now and then demand more than is necessary, in the view of individuals concerned or of the courts, but that fact, if it be a fact, is not a ground for the slightest interference on the part of the courts. (*United Public Workers* v. *Mitchell* (1947) 330 U.S. 75 [91 L.Ed. 509 [754], 67 S.Ct. 556].)

" 'There remains then to consider whether the action, or the alleged threatened action, of the board or its agents, violates the rights of the plaintiffs under the federal or the state Constitutions. The plaintiffs contend that their rights in this respect are violated in view of the provisions of the First and Fourteenth Amendments of the federal Constitution and the cognate provisions of our state Constitution.

" 'Shortly stated, the plaintiffs contend that the action of the board and its agents in requiring the employees to take the oath propounded and to give answer to the questionnaire, under oath, violates an employee's rights guaranteed to him under the federal and the state Constitutions. These rights, as set forth by the plaintiffs, are as follows:

" ' (1) "Every citizen may freely speak . . . his sentiments on all subjects, being responsible for the abuse of that right . . ." (California Constitution, Article I, Section 9.)

" ' (2) "The people shall have the right to freely assemble together to consult for the common good, to instruct their Representatives, and to petition the Legislature for redress of grievances." (Calif. Const., Art. I, Sec. 10.)

" ' (3) "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (14th Amendment, U.S. Const.)

" 'In viewing the constitutional mantle thrown around an individual it is important to remember that the mantle is a *safeguard,* not *absolute,* but *relative* and *qualified.* Our federal and state constitutional provisions, which guarantee freedom of speech and of opinion, freedom of the press, freedom of assembly, are not licenses to do completely as one chooses without regard to the other fellow, who possesses exactly the same liberties. When one purports to pursue the liberties granted by the Constitution he needs to remember that the other fellow has equal liberties and, what is more, he has the liberty to refuse to listen to another's speech or opinion and the right to refuse to yield to him his own right of assembly. Conceivably,

a person may be of the opinion that is is entirely proper to drive through a stop light, or on city streets at 80 miles an hour in violation of an ordinance, but even so, setting up constitutional provisions as a defense will prove ill-advised. So, too, one may believe that the 14th Amendment is a defense to acts that sabotage the government or are subversive to it, but one will quickly find that the constitutional provision against treason is not cut down or modified, in the least, by the First Amendment or any other provision of the federal or state constitutions.

" 'In what manner, then, do the requirements as laid down by the board, or as applied by its agents, impinge on the constitutional rights of the plaintiffs or any other officer or employee subject to the general jurisdiction of the board? Some of the plaintiffs, but not all of them, do say that they have no objection to an oath that would require them to support the Constitution, federal and state, but that the oath in question goes further and, consequently, violates their constitutional rights. The oath, it is true, calls upon the employee not only to support the Constitution, state and federal, but to abjure enemies of the government, both domestic and foreign, but even if that be true, as it is, what is wrong with that in these United States? Moreover, where is the constitutional provision which directly or indirectly prohibits the board from demanding that an employee subscribe to the oath? The answer is, there is none, and therefore no more need be said on that subject.

" 'We come next to the questionnaire. It requires that the employee, aside from taking the oath submitted, answer under oath (1) whether or not he advocates the overthrow of the government and whether or not, since December 1, 1941, he has been a member of any political party or organization that advocates the overthrow of the government by force or violence; (2) the name or names which he has used or been known by; (3) whether or not he has been a member of or directly or indirectly supported any of the organizations listed on the questionnaire.

" 'With the respect to these particular questions in the questionnaire, the plaintiffs contend they violate their constitutional rights, in that, whether they do or do not personally advocate the overthrow of the government by force or violence, or belong or do not belong to organizations with such objectives, the provisions of the two constitutions sustain them in their refusal to answer. This is the crux of the argument of

the plaintiffs in this aspect of the case. Accordingly, we may now proceed at once to a determination of the issue thus made.

" 'A year ago the Supreme Court of the United States answered these identical contentions in the case of *United Public Workers* v. *Mitchell,* 330 U.S. 75 [91 L.Ed. 509 [754], 67 S.Ct. 556]. Accordingly we may now well turn to that decision for the light it throws on the very similar problem which is posed in the case before us. In that case, instituted by civil service employees, as is the case here, it was contended that the so-called federal Hatch Act [54 Stats. 767, 18 U.S.C. § 61h], in prohibiting federal classified civil service employees from taking "any active part in political management or in political campaigns," violated their constitutional rights in that it prohibited them from doing the very thing which an ordinary citizen could do with impunity. Accordingly, in that case as here, the plaintiffs sought declaratory relief and an injunction. In holding that the act was constitutional, the court pointed out that as early as 1882 the court had held that it was entirely proper for Congress to prohibit party activity by federal employees in the classified service. The court said: "The conviction that an actively partisan governmental personnel threatens good administration has deepened since *Ex Parte Curtis* (196 U.S. 371 (1882) [27 L.Ed. 232, 1 S.Ct. 381]) . . . Congress and the President are responsible for an efficient public service. If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, we see no constitutional objection . . . to declare that the present supposed evils of political activity are beyond the power of Congress to redress would leave the Nation impotent to deal with what many sincere men believe is a material threat to the democratic system.

" ' " ". . . The determination of the extent to which political activities of government employees shall be regulated lies primarily with Congress. Courts will interfere only when such regulation passes beyond the general existing conception of governmental power . . .

" ' " "When actions of civil servants in the judgment of Congress menace the integrity and the competency of the service, legislation to forestall such danger and adequate to maintain its usefulness is required. The Hatch Act is the answer of Congress to this need. We cannot say with such a background that those restrictions are unconstitutional.". . .

" 'In view of the decisions just quoted . . . it seems clear

that the acts of the defendant Board and its agents, whether they go to the extent claimed by the plaintiffs or not, are within the scope of the power of the board and are in no sense unconstitutional. Whether the appointing power will or will not discharge employees as claimed by the plaintiffs, for causes of the character enumerated, and whether the civil service Commission will uphold such discharges, if any, on such causes, are not matters upon which this Court may speculate or adjudicate at this time. . . .' ''

Accordingly, the District Court of Appeal affirmed the judgment of the superior court in favor of defendants. Subsequently, the Supreme Court of California denied a petition for hearing on January 10, 1949.

In *Garner* v. *Board of Public Works,* 98 Cal.App.2d 493 [220 P.2d 958],[1] the City of Los Angeles adopted a resolution requiring its officers and employees to take an oath and execute an affidavit similar to those required by the County of Los Angeles in the *Steiner* case. Seventeen employees of the city refused to comply with the ordinance and were discharged. They filed consolidated petitions for writ of mandate directing reinstatement and payment of salaries from the date of their discharge. The superior court denied the petition, and on appeal the District Court of Appeal said, at pages 495-499:

''The issues involved in this case have been set forth and disposed of in *Steiner* v. *Darby* (1948) 88 Cal.App.2d 481 [199 P.2d 429]. (Hearing denied by the Supreme Court, Jan. 10, 1949.)

''No good purpose would be served in repeating the reasoning so clearly and logically stated . . . in the Steiner case. In that case the law as developed to its date of decision is stated and applied.

''Since then, so far as brought to our attention, the principles here involved have been before the courts in the following cases:

''*Lawson* v. *United States,* 176 F.2d 49 [85 App. D.C. 167].

''In that case the United States Court of Appeals for the District of Columbia Circuit held that questions by a Congressional Committee to script writers for motion pictures whether they were or were not Communists were pertinent and proper; therefore contumacious witnesses were not protected by the Bill of Rights from answering.

---

[1]Opinion prepared by Justice Drapeau and concurred in by Presiding Justice White and Justice Doran.

"*L'Hommedieu* v. *Board of Regents of University of State of New York,* 276 App.Div. 494 [95 N.Y.S.2d 443].

"In that case the Supreme Court, Appellate Division, Third Department, of the State of New York held that a statute which provides for dismissal from the public school system of members of subversive organizations does not violate due process of law, nor does it infringe upon the freedoms of speech, press, or assembly.

"In that case it is said:

" 'There is no constitutional right to be a teacher any more than there is to be a public official or a member of any of the professions. No one has a constitutional right to advocate the overthrow of the government by force and violence. The courts have held time and time again that the freedoms guaranteed by the Constitution are not absolute but must yield to the public welfare. (Page 451 [95 N.Y.S.2d].) . . .

" 'The most important qualification of a teacher is loyalty to our government. It necessarily follows that disqualification is advocacy of the overthrow of that government. The statute under review is a law dealing with public employment of teachers in our public schools. To avail oneself of the privilege of teaching certain qualifications must be possessed, certain rights renounced. This is not an unconstitutional classification. (Citing cases.)

" 'When it comes to loyalty to our government, the affirmation of loyalty, the denial of disloyalty, renunciation of membership in organizations advocating overthrow of our government or subscribing to subversive tenets, all have been upheld as qualifications of public employment or of holding office in organizations availing themselves of statutory privileges. (Citing cases.) (Pages 452-453 [95 N.Y.S.2d].) . . .

" ' "The Constitution," said the United States Supreme Court in *United States ex rel. Milwaukee Social Democratic Pub. Co.* v. *Burleson,* 255 U.S. 407, 414 [65 L.Ed. 704, 710, 41 S.Ct. 352, 355] "was adopted to preserve our government, not to serve as a protecting screen for those who, while claiming its privileges, seek to destroy it." A contemporary statement of the same principle is found in *Barksy* v. *United States,* 167 F.2d 241 [83 App.D.C. 127], certiorari denied 334 U.S. 843 [92 L.Ed. 1767, 68 S.Ct. 1511].'

"*American Communications Assn.* v. *Douds,* 339 U.S. 382 [94 L.Ed. 925, 70 S.Ct. 674].

"In that case, decided May 8, 1950, the United States Supreme Court upheld the constitutionality of subsection

9(h) of the Labor Management Relations Act of June 23, 1947. (29 U.S.C.A. § 159(h).) This section denies labor unions the right to present cases to the National Labor Relations Board unless there is on file with the Board '. . . an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods.'

''The following comments by the court are applicable to the case at bar:

'' '. . . If accidents of birth and ancestry under some circumstances justify an inference concerning future conduct, it can hardly be doubted that voluntary affiliations and beliefs justify a similar inference when drawn by the legislature on the basis of its investigations. (Page 940 [94 L.Ed.].)

'' '. . . The exercise of particular First Amendment rights may fly in the face of the public interest in . . . Government's obligation to provide an efficient public service. . . . (Page 943 [94 L.Ed.].) . . .

'' 'We have previously had occasion to consider other statutes and regulations in which the interests involved were, in large measure, like those now being considered. In *United Public Workers* v. *Mitchell,* 330 U.S. 75 [91 L.Ed. 754, 67 S.Ct. 556], *supra,* we upheld a statute which provided that employees of the Federal Government could not participate in partisan political activities, concededly a First Amendment right, if they would retain their positions. The decision was not put upon the ground that government employment is a privilege to be conferred or withheld at will. For it was recognized that Congress may not ''enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take active part in missionary work.'' 330 U.S. at p. 100 [91 L.Ed. at p. 773, 67 S.Ct. 556]. But the rational connection between the prohibitions of the statute and its objects, the limited scope of the abridgment of First Amendment rights, and the large public interest in the efficiency of government service, which Congress had found necessitated the statute, led us to the conclusion that the statute may

stand consistently with the First Amendment.' (Page 947 [94 L.Ed.].)

"In the present case petitioners fail to understand that loyalty is indispensably necessary in the employer-employee relationship between the state and its servants. It is treasonable to advocate the destruction by force of the government for which one works. It is an ever-present threat to government itself to have treasonable persons charged with the conduct of public affairs. Having such people on the payroll results in impairment of governmental service. In times of national stress it would seriously affect the functioning of government. It is, therefore, the duty of those charged with the management of the business of government to ascertain, require, and insure unconditional, unswerving loyalty of every servant of the people, high or low.

"One of the foundation stones of private business is that the employee must be loyal to his employer. Loyalty is implicit in the contract of hiring. No private business can long succeed without the conscientious, undivided support of its employees. The man or woman who denies allegiance to his employment is, and should be, soon separated from it. Nemesis with a club waits for him around the corner. And, so long as the employment continues, every employer has the right at any time to ask his employee to declare his loyalty.

" 'But,' say some of the petitioners, 'we're loyal. We will take the oath to defend and support the Constitution of the United States and of the State of California. What we object to is that we are required, under oath, to express our beliefs; it inquires into our thinking today, our thinking tomorrow.'

"A paragraph from a letter of one of the petitioners reads as follows:

" 'It violates the right of every individual to free political association, singling out the Communist Party and saying, in effect, that no city worker has a right to belong to it. Not that it says so specifically. But every worker who signs the oath and affidavit knows by the mere juxte position (*sic*) of the three questions, *Loyalty, Force-and-violence, Communist Party*, that membership in the latter is considered evidence of disloyalty and shows the desire to overthrow the government by force and violence "or other unlawful means." Actually, according to Supreme Court decision, the Communist Party is a legally constituted party entitled to all the electoral privileges accorded any other legal party. My employer, the City of Los Angeles, has no right to ask me whether or not I belong

to the Communist, the Republican, the Democratic, or the Prohibition Party. My party affiliations, according to the Constitution of the United States, are strictly my own affair.'

''It is an interesting question whether the legislative power may require disclosure or disavowal of mere beliefs or opinions, without overt acts. The argument may be followed extensively in the dissenting and concurring opinion of Mr. Justice Jackson in *American Communications Assn.* v. *Douds, supra.*

''That question is not present in this case. The ordinance under consideration does not call for beliefs. It provides that one must aver whether or not he is or ever was a member of the Communist party or the Communist Political Association; that he has not within five years advocated the overthrow of the government by force, violence, or unlawful means; that he is not and has not been a member of any group, society, association, organization, or party which advises or teaches overthrow of the government by such means; and that while he is in the service of the city he will not belong to or become a member of any such group, or advocate or teach such subversive doctrines.

''The right of the people of the State of California to have their employees declare their allegiance to the state, that they are not its enemies, and do not advocate or believe in destroying the state by force, violence or unlawful means, is not trammeled, infringed, or denied by any constitutional provision, by natural justice, or by common sense. The ordinance before this court, adopted by a subdivision of state government is well within the legislative power and a timely and proper exercise thereof.''

The District Court of Appeal affirmed the order denying petitioners' application for writ of mandate. The Supreme Court of California denied a petition for hearing in this case on September 13, 1950.

Thereafter the Supreme Court of the United States granted a writ of certiorari, followed by an opinion, which after setting forth the relevant portions of the oath and affidavit, reads:

''Petitioners attack the ordinance as violative of the provision of Art. 1, § 10 of the Federal Constitution that 'No State shall . . . pass any Bill of Attainder, [or] ex post facto Law . . . .' They also contend that the ordinance deprives them of freedom of speech and assembly and of the right to petition for redress of grievances.

"Petitioners have assumed that the oath and affidavit provisions of the ordinance present similar constitutional considerations and stand or fall together. We think, however, that separate disposition is indicated.

"1. The affidavit raises the issue whether the City of Los Angeles is constitutionally forbidden to require that its employees disclose their past or present membership in the Communist Party or the Communist Political Association. Not before us is the question whether the city may determine that an employee's disclosure of such political affiliation justifies his discharge.

"We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment. The affidavit requirement is valid.

"2. In our view the validity of the oath turns upon the nature of the Charter amendment (1941) and the relation of the ordinance (1948) to this amendment. Immaterial here is any opinion we might have as to the Charter provision insofar as it purported to apply retrospectively for a five-year period prior to its effective date. We assume that under the Federal Constitution the Charter amendment is valid to the extent that it bars from the city's public service persons who, subsequent to its adoption in 1941, advise, advocate, or teach the violent overthrow of the Government or who are or become affiliated with any group doing so. The provisions operating thus prospectively were a reasonable regulation to protect the municipal service by establishing an employment qualification of loyalty to the State and the United States. Cf. *Gerende* v. *Board of Supervisors of Elections* (1951) 341 U.S. 56 [ante [95 L.Ed.] 745, 71 S.Ct. 565]. Likewise, as a regulation of political activity of municipal employees, the amendment was reasonably designed to protect the integrity and competency of the service. This Court has held that Congress may reasonably restrict the political activity of federal civil service employees for such a purpose, *United Public Workers* v. *Mitchell* (1947) 330 U.S. 75, 102, 103 [91 L.Ed. 754, 774, 775, 67 S.Ct. 556], and a State is not without power to do as much.

"The Charter amendment defined standards of eligibility

for employees and specifically denied city employment to those persons who thereafter should not comply with these standards. While the amendment deprived no one of employment with or without trial, yet from its effective date it terminated any privilege to work for the city in the case of persons who thereafter engaged in the activity proscribed.

"The ordinance provided for administrative implementation of the provisions of the Charter amendment. The oath imposed by the ordinance proscribed to employees activity which had been denied them in identical terms and with identical sanctions in the Charter provision effective in 1941. The five-year period provided by the oath extended back only to 1943.

"The ordinance would be ex post facto if it imposed punishment for past conduct lawful at the time it was engaged in. Passing for the moment the question whether separation of petitioners from their employment must be considered as punishment, the ordinance clearly is not ex post facto. The activity covered by the oath had been proscribed by the charter in the same terms, for the same purpose, and to the same effect over seven years before, and two years prior to the period embraced in the oath. Not the law but the fact was posterior.

"Bills of attainder are 'legislative acts . . . that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial . . . .' *United States* v. *Lovett* (1946) 328 U.S. 303, 315 [90 L.Ed. 1252, 1259, 66 S.Ct. 1073]. Punishment is a prerequisite. See concurring opinion in *United States* v. *Lovett, supra* (328 U.S. at pp. 318, 324 [90 L.Ed. 1261, 1264, 66 S.Ct. 1073]). Whether legislative action curtailing a privilege previously enjoyed amounts to punishment depends upon 'the circumstances attending and the causes of the deprivation.' *Cummings* v. *Missouri* (1867) 4 Wall. [71 U.S.] 277, 320 [18 L.Ed. 356, 362]. We are unable to conclude that punishment is imposed by a general regulation which merely provides standards of qualification and eligibility for employment.

"*Cummings* v. *Missouri* (1867) 4 Wall. [71 U.S.] 277 [18 L.Ed. 356], and *Ex parte Garland* (1867) 4 Wall. [71 U.S.] 333 [18 L.Ed. 366], the leading cases in this Court applying the federal constitutional prohibitions against bills of attainder, recognized that the guarantees against such legislation were not intended to preclude legislative definition of

standards of qualification for public or professional employment. Carefully distinguishing an instance of legislative 'infliction of punishment' from the exercise of 'the power of Congress to prescribe qualifications,' the Court said in Garland's Case: 'The legislature may undoubtedly prescribe qualifications for the office, to which he must conform, as it may, where it has exclusive jurisdiction, prescribe qualifications for the pursuit of any of the ordinary avocations of life.' 4 Wall. [71 U.S.] at pp. 379, 380 [18 L.Ed. at p. 370]. See also *Cummings* v. *Missouri, supra,* 4 Wall [71 U.S.] at pp. 318, 319 [18 L.Ed. 361, 362]). This doctrine was reaffirmed in *Dent* v. *West Virginia* (1889) 129 U.S. 114 [32 L.Ed. 623, 9 S.Ct. 231], in which Mr. Justice Field, who had written the *Cummings* and *Garland* opinions, wrote for a unanimous Court upholding a statute elevating standards of qualification to practice medicine. And in *Hawker* v. *New York* (1898) 170 U.S. 189 [42 L.Ed. 1002, 18 S.Ct. 573], the Court upheld a statute forbidding the practice of medicine by any person who had been convicted of a felony. Both *Dent* and *Hawker* distinguished the *Cummings* and *Garland* Cases as inapplicable when the legislature establishes reasonable qualifications for a vocational pursuit with the necessary effect of disqualifying some persons presently engaged in it.

''Petitioners rely heavily upon *United States* v. *Lovett* (1946) 328 U.S. 303 [90 L.Ed. 1252, 66 S.Ct. 1073], in which a legislative act effectively separating certain public servants from their positions was held to be a bill of attainder. Unlike the provisions of the Charter and ordinance under which petitioners were removed, the statute in the *Lovett* Case did not declare general and prospectively operative standards of qualification and eligibility for public employment. Rather, by its terms it prohibited any further payment of compensation to named individual employees. Under these circumstances, viewed against the legislative background, the statute was held to have imposed penalties without judicial trial.

''Nor are we impressed by the contention that the oath denies due process because its negation is not limited to affiliations with organizations known to the employee to be in the proscribed class. We have no reason to suppose that the oath is or will be construed by the City of Los Angeles or by California courts as affecting adversely those persons who during their affiliation with a proscribed organization were innocent of its purpose, or those who severed their relations with any such organization when its character became apparent, or

those who were affiliated with organizations which at one time or another during the period covered by the ordinance were engaged in proscribed activity but not at the time of affiant's affiliation.[1] We assume that scienter is implicit in each clause of the oath. As the city has done nothing to negative this interpretation, we take for granted that the ordinance will be so read to avoid raising difficult constitutional problems which any other application would present. *Fox* v. *Washington* (1915) 236 U.S. 273, 277 [59 L.Ed. 573, 575, 35 S.Ct. 383]. It appears from correspondence of record between the city and petitioners that although the city welcomed inquiry as to its construction of the oath, the interpretation upon which we have proceeded may not have been explicitly called to the attention of petitioners before their refusal. We assume that if our interpretation of the oath is correct the City of Los Angeles will give those petitioners who heretofore refused to take the oath an opportunity to take it as interpreted and resume their employment.'' (*Garner* v. *Board of Public Works of Los Angeles,* 341 U.S. 716, 719-724 [95 L.Ed. 1317, 1322-1325, 71 S.Ct. 909].)

The Supreme Court thus reached the same conclusion as the District Court of Appeal had reached.

In *Keyishian* v. *Board of Regents,* 385 U.S. 589, 623-625 [17 L.Ed.2d 629, 652-653, 87 S.Ct. 675], Mr. Justice Clark, in a dissenting opinion concurred in by Mr. Justice Harlan, Mr. Justice Stewart, and Mr. Justice White, said: ''This Court has again and again, since at least 1951, approved procedures either identical or at the least similar to the ones the Court condemns today. In *Garner* v. *Board of Public Works of Los Angeles, supra,* we held that a public employer was not precluded, simply because it was an agency of the State, 'from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service.' 341 U.S. at p. 720, 95 L.Ed. at p. 1322. The oath there used

---

''[1]In interpreting local legislation proscribing affiliation with defective organizations, the Supreme Court of California has gone beyond the literal text of a statute so as to require knowledge of the character of the organization, as of the time of affiliation, by the person whose affiliation is in question. In *People* v. *Steelik* (1921) 187 Cal. 361 [203 P. 78], the Court upheld a conviction under the Criminal Syndicalism Act of 1919 which made one guilty of a felony who 'is' a member of any one of a certain class of proscribed organizations. The indictment in relevant part alleged that defendants 'are and each of them is' a member of a proscribed organization. The court interpreted the statute as defining and the indictment as charging 'the offense of criminal syndicalism, in that he *knowingly belonged*' to a proscribed organization. (Emphasis added.) 187 Cal. at p. 376.''

practically the same language as the Starbuck statement here and the affidavit reflects the same type of inquiry as was made in the old certificate condemned here. Then in 1952, in *Adler* v. *Board of Education*, 342 U.S. 485 [96 L.Ed. 517, 72 S.Ct. 380, 27 A.L.R.2d 472], *supra,* this Court passed upon the identical statute condemned here. It, too, was a declaratory judgment action—as in this case. However, there the issues were not so abstractly framed. Our late Brother Minton wrote for the Court:

" 'A teacher works in a sensitive area in a school-room. There he shapes the attitude of young minds toward the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted.' At p. 496, 96 L.Ed. at p. 526, 27 A.L.R.2d 472.

"And again in 1958 the problem was before us in *Beilan* v. *Board of Education, School Dist. of Philadelphia, supra* [357 U.S. 399 (2 L.Ed.2d 1414, 78 S.Ct. 1317)]. There our late Brother Burton wrote for the Court:

" 'By engaging in teaching in the public schools petitioner did not give up his right to freedom of belief, speech or association. He did, however, undertake obligations of frankness candor and cooperation in answering inquiries made of him by his employing Board examining into his fitness to serve it as a public school teacher.' 357 U.S. at p. 405, 2 L.Ed.2d at p. 1419.

"And on the same day in *Lerner* v. *Casey,* 357 U.S. 468 [2 L.Ed.2d 1423, 78 S.Ct. 1311], our Brother Harlan again upheld the severance of a public employee for his refusal to answer questions concerning his loyalty. And in the same Term my Brother Brennan himself cited *Garner* with approval in *Speiser* v. *Randall* (1958) 357 U.S. 513 [2 L.Ed.2d 1460, 78 S.Ct. 1332].

"Since that time the *Adler* line of cases have been cited again and again with approval: *Shelton* v. *Tucker* (1960) 364 U.S. 479 [5 L.Ed.2d 231, 81 S.Ct. 247], in which both *Adler* and *Beilan* were quoted with approval and *Garner* and *Lerner* were cited in a like manner; likewise in *Cramp* v. *Board of Public Instruction* (1961) 368 U.S. 278 [7 L.Ed.2d 285, 82 S.Ct. 275], *Adler* was quoted twice with approval; and, in a related field where the employee was discharged for refusal to answer questions as to his loyalty after being ordered

to do so, the Court cited with approval all of the cases which today it says have been rejected, i.e., *Garner, Adler, Beilan* and *Lerner. Nelson* v. *Los Angeles County* (1960) 362 U.S. 1 [4 L.Ed.2d 494, 80 S.Ct. 527]. Later *Konigsberg* v. *State Bar* (1961) 366 U.S. 36 [6 L.Ed.2d 105, 81 S.Ct. 997], likewise cited with approval both *Beilan* and *Garner*. And in our decision in *In re Anastaplo* (1961) 366 U.S. 82 [6 L.Ed. 2d 135, 81 S.Ct. 978], *Garner, Beilan* and *Lerner* were all referred to. Finally, only two Terms ago my Brother White relied upon *Cramp* which in turn quoted *Adler* with approval twice. See *Baggett* v. *Bullitt* (1964) 377 U.S. 360 [12 L.Ed. 2d 377, 84 S.Ct. 1316]."

From the foregoing, it is apparent that the majority opinion in the present case reaches a conclusion contrary to that previously reached by the District Courts of Appeal, this court, and the Supreme Court of the United States.

In my opinion, the judiciary should not disregard the law as laid down by the citizens of California, directly or through their representatives in the state Legislature.